**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDGAR RODRIGUEZ,**

**Plaintiff,**

**v.**                                                    **1:05-CV-322**
                                                          **(FJS/DRH)**

**BARBARA CLINTON, ELIZABETH**
**DAVIES, and NEW PALTZ CENTRAL**
**SCHOOL DISTRICT,**

**Defendants.**
_____

**APPEARANCES**                          **OF COUNSEL**

**LAW OFFICES OF**                        **MICHAEL H. SUSSMAN, ESQ.**
**MICHAEL H. SUSSMAN**
40 Park Place
Goshen, New York 10924
Attorneys for Plaintiff

**RYAN & SMALLACOMBE PLLC**              **CLAUDIA A. RYAN, ESQ.**
100 State Street                          **JOHN F. MOORE, ESQ.**
Suite 800
Albany, New York 12207
Attorneys for Defendants

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

Plaintiff's complaint asserts a First Amendment retaliation claim against each Defendant

based upon the New Paltz High School Parent-Teacher Student Association's ("PTSA")

Executive Board's removal of him from a school committee, the filing of a report with Child

Protective Services ("CPS") for educational neglect, and the threatened filing of a PINS[1] petition

about his child in retaliation for his protected speech concerning school district issues.  Plaintiff

also asserts a Fourteenth Amendment equal protection claim against each Defendant alleging

that the same conduct was motivated by discriminatory animus due to his race and/or national

origin.  Currently before the Court is Defendants' motion for summary judgment.


## II. BACKGROUND

Plaintiff Edgar Rodriguez is an American citizen born in New York to Puerto Rican

parents.  Plaintiff's wife, Margaret Veve, was employed by Defendant New Paltz Central School

District ("District") as Director of Pupil Personnel Services from 1993 through 1998 and was

also a member of the District's Board of Education from May 2004 through June 2005.  Plaintiff

is also actively involved with Defendant District.[2]  One of Plaintiff's children, A.R., was enrolled

in and attended school in the Defendant District until September 8, 2004.

Defendant Barbara Clinton is the principal of the New Paltz High School.  Defendant

Elizabeth Davies is a Guidance Counselor at the New Paltz High School and also the Chair of

the Child Study Team.[3]

---

[1] PINS is an acronym for Persons In Need of Supervision.

[2]  In June of 2006, Plaintiff was a parent representative to the New Paltz High School
Shared Decision-Making Team/Building Committee ("HSC").  Since being elected in 2005,
Plaintiff also serves as the diversity community representative to the New Paltz Central School
District Shared Decision-Making District Wide Committee ("DWC").  Since 2002, Plaintiff has
been a member of the PTSA.

[3] The other members of the Child Study Team are Guidance Counselor Maryann
Antonelle (Plaintiff's son's guidance counselor), School Psychologist Mary Kay Fiore, School
Social Worker Lisa Watkins, Assistant Principal Dennis DiBarri, the School Nurse and the
(continued...)

## III.  DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims.  As to Plaintiff's First Amendment claims based on the PTSA's removal, Defendants move for summary judgment on the following grounds: that the PTSA's removal lacked state action; failure to state a claim; lack of personal liability for the individual Defendants; lack of municipal liability of Defendant District; and statutory and qualified immunity.  As to Plaintiff's First Amendment claims based on the filing of the CPS report, Defendants move for summary judgment on the following grounds: failure to state a claim; lack of personal liability for the individual Defendants; lack of municipal liability of Defendant District; and statutory and qualified immunity.  As to Plaintiff's First Amendment claims based on the threat to file a PINS petition, Defendants move for summary judgment on the following grounds: failure to state a claim; lack of personal liability for the individual Defendants; lack of municipal liability of Defendant District; and statutory and qualified immunity.  As to Plaintiff's Fourteenth Amendment equal protection claim, Defendants move for summary judgment on the following grounds: the PTSA's removal lacked state action; failure to state a claim; lack of personal liability for the individual Defendants; lack of municipal liability of Defendant District; and statutory and qualified immunity.

**A.      Plaintiff's First Amendment retaliation claim based upon PTSA removal**

Plaintiff alleges that the PTSA Executive Board, acting jointly with Defendant Clinton, retaliated and discriminated against him by removing him from his position on the HSC.

---

[3](...continued)
Student Assistant Counselor.

Plaintiff contends that Defendant Clinton, as principal of the high school, and PTSA President Lisa Berger acted in concert to create sufficient nexus to find state action for the PTSA Executive Board's action.  In support of that contention, Plaintiff points to the long-standing relationship between Defendant Clinton and Ms. Berger, the number of times they met together, and Defendant Clinton's encouragement of Ms. Berger to take on the PTSA President position.

During November and December of 2004, Plaintiff and Ms. Berger had a disagreement about whether the PTSA had authorized Plaintiff to look into the school's eligibility policy.[4]  On December 15, 2004, the PTSA Executive Board convened a meeting to which Plaintiff was invited but did not attend.  *See* Defendants' Statement of Material Facts ("Defendants' Facts") at ¶¶ 69-70.  The PTSA Executive Board voted to relieve Plaintiff of his duties as the HSC representative.  *See id.* at ¶ 76.

"It is axiomatic that the First and Fourteenth Amendments, and § 1983, apply only to state actors."  *Leeds v. Meltz*, 85 F.3d 51, 54 (2d Cir. 1996).  Parent-Teacher organizations such as the PTSA are private actors.[5]  *See, e.g.*, *Holy Spirit Assoc. for Unification of World Christianity v. N.Y. State Congress of Parents & Teachers, Inc.*, 95 Misc. 2d 548, 551 (N.Y. Sup. Ct. 1978).  However, a private actor may be considered a state actor where the conduct "is 'fairly attributable to the state.'" *Leeds*, 85 F.3d at 54 (quoting *Rendell-Baker* [*v. Kohn*,] 457 U.S. [830,] 838, 102 S. Ct. at 2769 [(1982)]).  For private action to be fairly attributable to the state, the state

_____

[4] The disagreement arose over Plaintiff's belief that the PTSA had authorized him to bring the eligibility policy up at an HSC meeting and Ms. Berger's belief that, although Plaintiff was free to raise the issue at the HSC, he would not be doing so under the imprimatur of the PTSA.

[5] Defendant District recognizes, but does not govern, the PTSA.  The PTSA has executive officers, all of whom are parents elected by other PTSA parents.

must exert coercive power or provide significant encouragement.  *See id.*  The plaintiff must

demonstrate a sufficiently """close nexus between the State and the challenged action,"""" which

can be found where the State exercises coercive power, there is entwined management and

control, the State offers significant overt or covert encouragement, the private entity is a willful

participant in joint activity, the private entity is controlled by an agency of the state, the private

entity has been delegated a public function, or the private entity is entwined with governmental

policies.  *See Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312-13 (2d Cir. 2003) (quotation

and other citation omitted).  State approval or acquiescence is not state action where the private

entity initiates the conduct, and the State has not ordered the conduct.  *See id.* at 313 (quotation

omitted).

  Even taking the evidence in the light most favorable to Plaintiff, the evidence shows, at

most, that Ms. Berger was upset with Plaintiff following the December 8, 2004 Board of

Education meeting, and the preceding events, where she believed Plaintiff was overstepping his

authority.  Although Plaintiff alleges Ms. Berger discussed removing Plaintiff from the HSC

with Defendant Clinton and informed Defendant Clinton of the PTSA Executive Board's action,

he cannot show more than Defendant Clinton's approval and acquiescence in the PTSA

Executive Board's action.

  Plaintiff has not produced any evidence that Defendant Clinton ordered the removal or of

joint action or coercion.  In fact, it appears that Defendant Clinton worked to resolve the conflict

between Plaintiff and the PTSA Executive Board.[6]

---

[6] *See* Defendants' Facts at ¶¶ 86-88, 91-92.  On January 3, 2005, the PTSA met and
discussed whether the PTSA could remove Plaintiff from the HSC.  *See id.* at ¶¶ 84-85.

(continued...)

Based upon this evidence, the Court finds that the PTSA Executive Board's action was not a state action and, therefore, is not actionable as retaliatory conduct under the First Amendment or discriminatory conduct under the Fourteenth Amendment.  Accordingly, the Court grants Defendants' motion for summary judgment to the extent that Plaintiff's First Amendment retaliation claim and Fourteenth Amendment equal protection claim are based on the PTSA Executive Board's action.

**B.     Plaintiff's First Amendment retaliation claim based on the CPS report**

Plaintiff asserts a First Amendment retaliation claim based on Defendant District making a report to CPS that his son, A.R., was educationally neglected.  Where there is adverse action[7] against a plaintiff based on constitutionally protected speech rights, "a plaintiff must show that (1) his actions were protected by the First Amendment; and (2) the defendant's alleged conduct was in response to that protected activity."  *Velez v. Levy*, 401 F.3d 75, 97 (2d Cir. 2005)

---

[6](...continued)
Following this meeting, Defendant Clinton arranged to have a local politician, Susan Zimet, mediate the conflict between Ms. Berger and Plaintiff.  Thereafter, at a meeting that Ms. Zimet, Plaintiff and Ms. Berger attended, Ms. Berger agreed that the PTSA did not have the authority to remove Plaintiff from his HSC position and advised the PTSA Executive Board accordingly.  *See id.* at ¶¶ 86-88, 91-92.  On January 7, 2005, Plaintiff wrote the *New Paltz Times* that the issue of his removal was moot, and Plaintiff continued to serve on the HSC.  *See* Plaintiff's Response to Defendant's Rule 7.1(a)(3) Statement at ¶¶ 93-95.

[7] The Second Circuit's case law is far from clear as to the appropriate elements of a private citizen's First Amendment retaliation claim.  The Second Circuit has at least three formulations of the elements of a First Amendment retaliation claim.  *See Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:04-CV-1453, 2005 WL 1460424, *7 (N.D.N.Y. June 20, 2005) (citations omitted).  Accordingly, the Court can categorize Plaintiff's claims broadly into two analytical frameworks based on the retaliatory conduct:  (1) claims with an adverse action or independent injury, i.e., the filing of the CPS report, and (2) claims where Plaintiff's only injury is a violation of his First Amendment rights, i.e., the threatened filing of a PINS petition.

(citation omitted).  In this case, the parties do not dispute that Plaintiff engaged in protected activity.  Therefore, the Court need only consider whether Defendants' filing of the CPS report constituted adverse action and, if so, whether that filing was in response to Plaintiff's protected activity.

### 1.  Adverse action

The Second Circuit has noted that objective chill[8] is important to determining whether an action is sufficiently adverse.  *See N.Y. State Law Officers Union v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006) (noting that whether an action is adverse is a fact-specific determination and an important consideration is "whether the action . . . would 'deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights'" (quotation omitted)).[9] Although Plaintiff did not stop exercising his First Amendment rights and continued his advocacy, Plaintiff has raised a triable issue of fact as to whether the filing of a CPS report, with the potential negative consequences for a family, would "'deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'"  *Id*. (quotation omitted). Therefore, the Court must determine whether Defendants' actions were in response to Plaintiff's protected activity.

---

[8] The Second Circuit, in dicta, has noted that, in the employment and other contexts, subjective chill is not required where there is an independent injury.  *See Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004).

[9] Neither party presented substantive argument about objective chill.  Defendants merely discussed the lack of subjective chill, and Plaintiff did not address this issue at all.

### 2. Nexus between protected speech and adverse action

A plaintiff may rely upon circumstantial evidence of retaliatory intent to demonstrate that a nexus exists between his protected speech and the defendant's adverse action against him. *See Hous. Works*, *Inc. v. City of N.Y.*, 72 F. Supp. 2d 402, 422 (S.D.N.Y. 1999) (citations omitted). In *Hous. Works*, the court discussed three types of circumstantial evidence of retaliatory motive to prove causation: (1) proximity in time between the protected activity and the alleged retaliation, (2) disparate treatment of the plaintiff, and (3) a pattern of antagonism or prior retaliatory conduct. *See id.* at 422-26. "If the time that elapses between the protected activity and the adverse action is short enough, nothing more is necessary to satisfy the causation prong." *Holava-Brown v. Gen. Elec. Co.*, No. 98-9661, 189 F.3d 461, 1999 WL 642966, *3-*4 (2d Cir. Aug. 20, 1999) (unpublished opinion) (finding plaintiff met her burden to show a causal connection based on a two-month time period and citing cases where less than two months and twelve days were considered sufficient to create an inference of causation) (citations omitted).

Defendant Davies filed the CPS report following a meeting on December 21, 2004. *See* Affidavit of Elizabeth Davies, dated November 13, 2006 ("Davies Aff."), at ¶ 10. Plaintiff's primary acts of protected speech that he alleges led to the retaliation occurred at the November 1, 2004 PTSA Meeting; the December 8, 2004 Board of Education Meeting;[10] the December 15, 2004 Board of Education meeting; and Plaintiff's Letter to the Editor distributed to the School

---

[10] At the November 1, 2004 PTSA meeting, Plaintiff asked if he could bring the eligibility policy up at the next HSC meeting. *See* Defendants' Facts at ¶ 40; Affidavit of Edgar Rodriguez, dated December 22, 2006 ("Rodriguez Aff."), at ¶¶ 6-7. At a December 8, 2004 School Board meeting following Ms. Berger's statement about the November 1 meeting, Plaintiff said that the PTSA had directed him to raise the eligibility policy at the HSC meeting. *See* Defendants' Facts at ¶¶ 62-63. At this same meeting, Plaintiff Rodriguez also raised the issue of the election of community representatives to the DWC. *See id.* at ¶ 64.

Board on December 14, 2004, and published on December 16, 2004.[11]  All of these acts occurred within two months of the filing of the CPS report.  The Court finds that the proximity in time between Plaintiff's speech and Defendants' filing of the CPS report is sufficient to raise an issue of fact as to causation.

### 3.  *Non-retaliatory reason*

Since Plaintiff has raised a triable issue of fact regarding the two disputed elements of his claim, the Court must determine whether Defendants have demonstrated that they would have filed the CPS report even in the absence of Plaintiff's protected speech.  *See Hous. Works*, 72 F. Supp. 2d at 422 (finding that defendants may avoid liability if they can show they would have conducted the allegedly retaliatory action even in the absence of the plaintiff's protected speech (quotation and other citation omitted)).

Defendants contend that they filed the CPS report because A.R. was not receiving any educational services.  The record supports Defendants' assertion.  During the 2003-2004 school year, Plaintiff's son A.R. turned sixteen and was in tenth grade at New Paltz High School.  A.R. experienced academic difficulties and refused to attend school.  *See* Defendants' Facts at ¶ 117; Plaintiff's Response at ¶ 117.  Since July of 2003, A.R. had not always obeyed a curfew at home

---

[11] Plaintiff wrote a letter to the editor (published on December 16, 2004) and sent pre-publication copies to the School Board and the Superintendent's office, on Institutional Racism in School Elections.  At the December 15, 2004 Board of Education meeting, Plaintiff successfully advocated for a modification to the selection process for community representatives to the DWC.  Plaintiff was elected to the DWC in 2005 under the procedures he advocated for at the December 2004 meeting.

and had refused to go to counseling at the request of his parents.[12]  *See* Defendants' Facts at

¶ 118.  Since September of 2003, A.R. had not attended school regularly.  *See id.* at ¶ 120.  In

2003, Plaintiff and his wife contemplated filing a PINS petition,[13] and A.R. was entered into an

aversion program run by a Court-appointee.  *See id*. at ¶¶ 122-23; Plaintiff's Response at ¶¶ 122-

23.  Around Thanksgiving of 2003, A.R. attempted suicide and was hospitalized.  *See*

Defendants' Facts at ¶ 123.

    In the spring of 2004, A.R.'s attendance at school was very sporadic, and he was

classified for Special Education with an emotional disability.  *See* Defendants' Facts at ¶¶ 126-

27.  Plaintiff, his wife and district personnel disagreed about whether A.R.'s Individualized

Education Program ("IEP") would include home tutoring due to A.R.'s refusal to attend school;

no mediation was necessary as the CSE reached a consensus to include such tutoring.[14] *See*

Defendants' Facts at ¶¶ 131-35; Plaintiff's Response at ¶ 134.

    In May of 2004, Mary Kay Fiore and Lisa Watkins prepared a Functional Behavioral

Assessment and Behavioral Intervention Plan in conjunction with A.R.'s IEP.[15]  *See* Defendants'

Facts at ¶ 136.  The Behavioral Intervention Plan mentioned the possible use of PINS petitions to

address attendance concerns; Plaintiff and his wife objected to the PINS petition consideration.

---

[12] On October 10, 2003, A.R., without permission, drove his parents' car, hit a deer, and ran from the police.

[13] An unsigned petition is part of the record; it is not clear whether Plaintiff and his wife filed the petition.

[14] The CSE consisted of Chairperson Daniel Seyler-Wetzel, School Psychologist Mary Kay Fiore, School Social Worker Lisa Watkins, Plaintiff, his wife, and other individuals.

[15] Plaintiff argues that the Functional Behavioral Assessment and Behavior Intervention Plan were not valid without parental input.  *See* Plaintiff's Response at ¶ 136.

*See* Defendants' Facts at ¶ 139.

Following September 8, 2004, A.R. did not attend school.  A.R. received little or no home instruction.  *See* Defendants' Facts at ¶ 147.  In September, the CSE and Plaintiff and his wife agreed to residential placement for A.R; Plaintiff and his wife considered a list of schools and did not find any that were suitable for A.R. or that would accept him.  *See* Defendants' Facts at ¶¶ 151-54; Plaintiff's Response at ¶¶ 151-54.

On December 2, 2004, Defendant School District's Coordinator of Special Education, Daniel Syler-Wetzel, wrote a letter to Plaintiff and his wife  advising them that home tutoring and counseling were still available, urging placement at a residential school, or hospitalization. *See* Defendants' Facts at ¶¶158-59, 161, 165; Plaintiff's Response at ¶ 161.  Plaintiff and his wife rejected hospitalization and noted that A.R. refused tutoring.  *See* Defendants' Facts at ¶¶ 167, 170; Plaintiff's Response at ¶ 167.  On December 3, 2004, Assistant Superintendent of Pupil Personnel Services Stephanie Forsyth spoke with Plaintiff's wife about tutoring and residential placement.  *See* Defendants' Facts at ¶ 169.  On December 8, 2004, as requested, Plaintiff and his wife wrote a letter explaining why home tutoring was not possible for A.R.  *See* Defendants' Facts at ¶ 179.

On December 8, 2004, Plaintiff and his wife attended a CSE meeting.  *See* Defendants' Facts at ¶ 184.  At the meeting, Dr. Rubenstien, A.R.'s psychiatrist, indicated that medications were only partially successful for A.R. and that he was at risk for self harm and drug use.  *See id.* at ¶¶ 185-86.  The doctor suggested that a 24-hour school program would be better than living at home for A.R.; that such a school would be appropriate, if it was not dominated with delinquent children; and that as a last resort A.R. should be hospitalized.  *See id.* at ¶¶ 190-193.  At the

meeting, Plaintiff's wife indicated that she would be searching for a school and seeking reimbursement. *See id*. at ¶ 199. Plaintiff and his wife also advised that A.R. was refusing to go to school intakes to avoid a boarding school and that he was not taking any medications. *See id*. at ¶¶ 201-02. Plaintiff's wife identified a school in Texas but expressed reservations due to the distance. *See id*. at ¶ 205; Plaintiff's Response at ¶ 205.

Between December 8 and December 21, 2004, Plaintiff and his wife did not contact Defendant District to identify a residential program for A.R. *See* Defendants' Facts at ¶ 212; Plaintiff's Response at ¶ 212. Assistant Superintendent Forsyth and Interim Superintendent Rhine met and discussed A.R.; they agreed to get CPS involved in A.R.'s case. *See* Defendants' Facts at ¶¶ 215-216. Ms. Forsyth spoke with Defendant Davies and either requested discussion about the possibility of filing a CPS report (Defendants' characterization) or directed Defendant Davies to call CPS (Plaintiff's characterization). *See* Defendants' Facts at ¶ 217; Plaintiff's Response at ¶ 217. On December 21, 2004, the Child Study Team recommended that a CPS report and a PINS petition be filed. *See* Defendants' Facts at ¶ 221.

Based on this record, the Court finds Plaintiff has not produced any evidence to counter Defendants' contention that they would have filed the CPS report regardless of Plaintiff's political activity. Although Plaintiff focuses on Interim Superintendent Rhine's involvement and his political dispute with Plaintiff, Plaintiff relies on conclusory allegations and a statement by Mary Kay Fiore that the administration, by way of Ms. Forsyth, supported a CPS call. *See* Affidavit of Mary Kay Fiore, dated November 13, 2006 ("Fiore Aff."), at ¶ 12. However, Ms. Fiore states that the Child Study Team discussed a CPS report and recommended such a report, not that they did so based on an order from the administration. *See id*. Furthermore, Ms.

Forsyth, who was in contact with Plaintiff and his wife on December 3, 2004 prior to most of

Plaintiff's protected activity, is the one who asked Defendant Davies to have the Child Study

Team discuss a CPS report, and the Child Study Team made the decision.  Plaintiff's allegation

that Mr. Rhine decided to call CPS and directed the Child Study Team to do so is unsupported

speculation.  Since Plaintiff has failed to raise a genuine issue of material fact as to whether

Defendants would have filed the CPS report in the absence of Plaintiff's protected speech, the

Court grants Defendants summary judgment on this ground.


C.      **Plaintiff's First Amendment retaliation claim based on the threatened filing of the PINS petition**

        Plaintiff's retaliation claim based on the PINS petition involves only a threat without any

actual injury.  For such a "First Amendment retaliation claim, a plaintiff must allege that (1) he

has an interest protected by the First Amendment, (2) the defendant's actions were motivated by

or substantially caused by the plaintiff's exercise of that right, and (3) the defendant's action

effectively chilled the exercise of the plaintiff's First Amendment rights."  *Ford v. Reynolds*, 167

Fed. Appx. 248, 250 (2d Cir. 2006) (unreported decision) (citation omitted).  In *Ford*, the

Second Circuit noted that "[t]he allegation of a chill is indispensable for private plaintiffs."  *Id.*

(finding no chill in mooted alleged threats of suspension or expulsion from school or in harm to

contractual rights and rights to prospective economic advantage) (citation omitted).  There are

two types of chill - objective and subjective.  Since Plaintiff did not suffer an independent injury

as a result of the threat of filing a PINS petition, the Court, in applying *Ford* to this claim, will

require Plaintiff to show subjective chill.

        "The fact that a party has continued to exercise its First Amendment rights to some

-13-

extent, does not mean that it is not being chilled into engaging in less speech than it otherwise would have;" a minimal loss of First Amendment freedoms is irreparable harm. *Hous. Works*, 72 F. Supp. 2d at 421 (considering a preliminary injunction motion) (citation omitted). The Court finds that Plaintiff has failed to assert a prima facie case for First Amendment retaliation based on the threatened filing of a PINS petition because he has not asserted or provided any evidence that the threat subjectively chilled his exercise of his rights. Plaintiff's only allegation is that he and his family waited for the other shoe to drop regarding the PINS petition. Plaintiff continued to fight his removal from the HSC and was elected to the DWC under his advocated-for election procedure. Defendants assert that Plaintiff has continued to speak out on school issues, and Plaintiff has not denied this. Thus, there is no evidence that Plaintiff engaged in less speech than he otherwise would have, let alone stopping altogether. Accordingly, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim to the extent it is based on Defendants' threat to file a PINS petition.

### D.    Fourteenth Amendment equal protection claim

Plaintiff asserts a claim for an equal protection violation against all Defendants on the basis that the same conduct,[16] alleged to be retaliatory in violation of the First Amendment, was also motivated by a discriminatory animus against Plaintiff due to his race and national origin.

The Equal Protection Clause of the Fourteenth Amendment directs that "'all persons similarly situated should be treated alike.'" *Velazquez v. City of New York*, No. 99 Civ. 3594,

---

[16] For the same reasons as discussed above, lack of state action precludes Plaintiff's claim to the extent it is based on his removal from the HSC. *See Leeds*, 85 F.3d at 54.

2000 WL 325683, *8 (S.D.N.Y. Mar. 28, 2000) (quotation and other citation omitted).  A plaintiff who alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner need not show a better treated, similarly situated group of individuals of a different race; rather, such a plaintiff may prove an equal protection violation by intentional discrimination in several ways, including "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner . . . ."  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).  A plaintiff must substantiate the claim that the discriminatory acts were motivated by racial discrimination.  *See id.*  Conclusory allegations are insufficient to survive summary judgment unless supported by facts that may prove invidious discriminatory intent or purpose.  *See Velazquez*, 2000 WL 325683, at *8.  Discriminatory purpose requires that the "'decision maker . . . selected or reaffirmed a particular course of action at lease [sic] in part "because of," not merely "in spite of," its adverse effects . . . .'"  *Id.* (quotation omitted).  Such intent or purpose may be proven by direct or indirect evidence.[17]

Alternatively, a plaintiff may prove a selective treatment claim by showing "both (1) that [he was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."'"  *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)

---

[17] In their memorandum of law, Defendants cite cases from the class-of-one line of cases rather than racial discrimination cases.  Accordingly, Defendants argue that Plaintiff must show similarly situated individuals and a rational basis test.  *See* Defendants' Memorandum of Law at 13.  Plaintiff cites no cases in the section of his memorandum of law addressing his Fourteenth Amendment claim.  *See* Plaintiff's Memorandum of Law at 18-22.  Despite Plaintiff's lack of legal citation, the Court construes Plaintiff's argument as asserting both an intentional discrimination claim and a selective treatment claim.

(applying test where the plaintiff was not a member of a suspect class) (quotation omitted).

Since Plaintiff appears to assert a claim for both intentional discrimination and disparate

treatment, the Court will analyze whether Defendants are entitled to summary judgment on both

claims.

### 1. Intentional discrimination

#### a. Defendant District

Ed Rhine, Interim Superintendent, wrote a memorandum to the Board of Education on

December 14, 2004, that Plaintiff contends demonstrates racial animus. *See* Rodriguez Aff.,

Exhibit 1. The memorandum consists of observations and recommendations to the Board of

Education about the selection of diversity representatives to the DWC. Mr. Rhine advocates for

election of the diversity representative by the entire community rather than by the subgroups that

the representative represents. The Rhine memorandum (1) uses quotation marks to offset certain

words, e.g., diversity and progressive; (2) notes that the committee has been "'monitored' by

Edgar Rodriguez" with the objective of imposing Plaintiff's favored election method; (3) states

that the arguments supporting Plaintiff's position are "not logical;" (4) and characterizes

Plaintiff's dispute with the School Administration as a "struggle for power and control" and that

"a minority group within this community [is] attempting to control the school district." *See id*.

Defendants argue that Mr. Rhine is merely advocating a position, i.e., that he is concerned that,

due to the consensus nature of the DWC, if a small group of the population controls the selection

of one member of the DWC, then a minority, as opposed to the majority, of people effectively

controls the entire DWC. Mr. Rhine never explicitly states that he is motivated because Plaintiff

is Hispanic. Accordingly, Defendants contend that Mr. Rhine's use of the word minority was not meant in a racial sense.

The Court finds that there is no issue of fact as to whether Mr. Rhine's actions regarding the filing of the CPS report were motivated by Plaintiff's race.  Even casting the evidence in the light most favorable to Plaintiff, Plaintiff's characterization of Mr. Rhine's arguably sarcastic treatment of the concepts of "diversity," "progressive," and "'correct' person to be President," as well as his ambiguous use of "minority group," as evidence of racial motivation is mere speculation.  Plaintiff has offered nothing other than this memorandum and the associated political debate regarding diversity representation on school committees as evidence of discriminatory intent.  Accordingly, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact as to whether Interim Superintendent Rhine, and thus Defendant District,[18] intentionally discriminated against him by filing the CPS report.

### b. Defendant Clinton

Plaintiff alleges that,

> in 2002, Clinton supported [in writing] my removal as parent
> representative to the Comprehensive District Education Planning
> Committee, that she had been hostile toward my views as
> expressed on educational policy matters on numerous occasions
> after her 2002 effort to have me removed from CDEP failed, that
> she supported the election of a new parent representative in 2003,
> claiming falsely that my term had expired, and that in the spring of

---

[18] Defendant District would be liable for Interim Superintendent Rhine's actions because he is a school administrator whose acts constitute official policy.  *See Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (quotation omitted); *Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F. Supp. 2d 224, 234 (E.D.N.Y. 2003) (collecting cases where New York school administrators were found to have final policy making authority).

> 2004, by her own admission, Clinton was part of the process of
> selecting temporary community representatives for the district
> wide committee and opposed my selection.

*See* Rodriguez Aff., at ¶ 18.  Plaintiff contends that these actions occurred because Defendant

Clinton "refused to respect the imperative of appointing a minority group member to the shared

decision-making process."  *See* Plaintiff's Memorandum of Law at 19.  Plaintiff also references

his December 16, 2004 letter to the editor wherein he asserts that the secret appointment process

he was advocating against because diversity representatives would be selected by "white school

employees and one white parent" and not by the "community with children of color."  *See*

Rodriguez Aff., at Exhibit 2.  Defendant Clinton's actions, without more, do not give any

indication of discrimination based on race or national origin.  To the contrary, they appear to

consist of a political disagreement and any assertion of a racial bias is too conclusory.

Plaintiff also argues that Defendant Clinton "automatically concurred" in the decision to

file the CPS report; but Plaintiff notes that Defendant Clinton, at her deposition, acknowledged

she knew A.R. was under care and treatment, thought the family could have accepted one of the

CSE recommendations without being able to identify any such recommendations and did not

know about A.R.'s recommended placement for 2004-05.  These facts, even if true, do not

indicate any racial motivation.

Accordingly, the Court grants Defendant Clinton's motion for summary judgment on

Plaintiff's intentional discrimination equal protection claim.

### c. Defendant Davies

Plaintiff has not presented any evidence that Defendant Davies acted with discriminatory

animus.  Similar to Plaintiff's claim against Defendant Clinton, Plaintiff has presented no

evidence that Defendant Davies was racially motivated or aware that the decision to direct her to

file the CPS was racially motivated.  Accordingly, the Court grants Defendant Davies' motion for

summary judgment on Plaintiff's intentional discrimination equal protection claim.

### 2.  *Disparate treatment*

In his submissions, Plaintiff sets forth facts to contend that Defendant School District did

not report white families to CPS under similar circumstances.  However, Plaintiff has failed to

counter Defendants' evidence that none the families Plaintiff identified were sufficiently

similarly situated and/or received disparate treatment.  Defendants presented evidence that the

children whom Plaintiff identified, in the Sp. and St. families, were either attending other schools

or did not have attendance problems.  Defendants presented evidence that ten CPS calls were

made regarding students in the last three years, including six Caucasian families.  Plaintiff

counters that most of these calls were for physical abuse.  The Court notes that only one other

student was reported to CPS for non-attendance, a child of Pakistani descent.  *See* Fiore Aff. at ¶

13.  Thus, even if the only CPS reports for non-attendance were minority students, Plaintiff has

still not presented any evidence of similarly-situated non-minority families who were treated

differently.  With regard to PINS petitions, Defendants presented evidence that, since the fall of

2003, six PINS petitions were filed, five for attendance issues, four of the six students were

Caucasian, and all five of the attendance-related petitions were filed for students who missed less

school than A.R.  *See* Affidavit of Lisa Watkins, sworn to November 15, 2006, at ¶ 12.

Accordingly, the Court finds that Plaintiff has failed to demonstrate a disputed issue of material

-19-

fact for trial regarding disparate treatment of similarly-situated Caucasian families.[19]


## IV.  CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment for Defendants and close this case.

**IT IS SO ORDERED.**

Dated: February 4, 2009
       Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

---

[19] Since the Court has determined that Defendants are entitled to summary judgment on the merits of Plaintiff's claims, the Court does not need to address whether the individual Defendants are entitled to statutory or qualified immunity.

-20-